UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRADY CENTER TO PREVENT GUN VIOLENCE,<br><br>Plaintiff,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS, *et al.*,<br><br>Defendants. | Civil Action No. 26-1980 (RDM) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

I. ATF's DL2 Program Utilizes Federally Licensed Gun Dealers as the First Line of Defense Against Gun Trafficking. ........ 2

II. The Trump Administration's Hostility to the DL2 Program. ........ 5

III. ATF Categorically Denied Brady's FOIA Request for Recent DL2s, Sharply Breaking from Prior Practice. ........ 6

IV. The Status of This Litigation. ........ 7

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. ATF Cannot Categorically Withhold the Requested DL2 Letters under Exemptions 6 and 7(C). ........ 9

A. Dealers in the Business of Selling Firearms Do Not Have "Personal" Privacy Interests Protected by Exemptions 6 and 7(C). ........ 10

B. Even if Gun Dealers Had Protectible Privacy Interests, the Public Interest in Disclosure Would Outweigh Them. ........ 11

II. ATF Has Not Met Its Burden to Categorically Withhold the DL2 Letters under Exemption 4. ........ 13

CONCLUSION ........ 17

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abramski v. United States*,
573 U.S. 169 (2014)....................3

*ACLU v. CIA*,
710 F.3d 422 (D.C. Cir. 2013)....................9, 16

*Bartko v. DOJ*,
898 F.3d 51 (D.C. Cir. 2018)....................12

**CREW v. DOJ*,
746 F.3d 1082 (D.C. Cir. 2014)....................8, 13

**CREW v. DOJ*,
58 F.4th 1255 (D.C. Cir. 2023)....................14, 15, 16

*Ctr. to Advance Sec. in Am. v. USAID*,
2025 WL 763735 (D.D.C. Mar. 11, 2025)....................2

*Dep't of the Air Force v. Rose*,
425 U.S. 352 (1976)....................8

**Doe 1 v. FEC*,
920 F.3d 866 (D.C. Cir. 2019)....................10, 11

*DOJ v. Reps. Comm. for Freedom of Press*,
489 U.S. 749 (1989)....................8

*Edelman v. SEC*,
239 F. Supp. 3d 45 (D.D.C. 2017)....................11

**FCC v. AT&T, Inc.*,
562 U.S. 397 (2011)....................10

**Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019)....................15

*Huddleston v. United States*,
415 U.S. 814 (1974)....................3

*Leopold v. DOJ*,
94 F.4th 33 (D.C. Cir. 2024) ....................16

*NARA v. Favish*,
541 U.S. 157 (2004)....................12

*Nat'l Ass'n of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002) ....................8

*Petroleum Info. Corp. v. DOI*,
976 F.2d 1429 (D.C. Cir. 1992) ....................8, 9

*Pub. Citizen Health Rsch. Grp. v. FDA*,
704 F.2d 1280 (D.C. Cir. 1983) ....................13

*Reps. Comm. for Freedom of Press v. CBP*,
567 F. Supp. 3d 97 (D.D.C. 2021) ....................17

*Reps. Comm. for Freedom of Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ....................17

**Shteynlyuger v. CMS*,
698 F. Supp. 3d 82 (D.D.C. 2023) ....................10, 16, 17

*Sims v. CIA*,
642 F.2d 562 (D.C. Cir. 1980) ....................11

*Wash. Post Co. v. DOJ*,
863 F.2d 96 (D.C. Cir. 1988) ....................11

**Statutes**

5 U.S.C. § 552.................... *passim*

18 U.S.C. § 923(a) ....................10

Gun Control Act of 1968, Pub. L. No. 90-618....................5

**Rules**

Fed. R. Civ. P. 56(a) ....................8

**Other Authorities**

Agency Information Collection Activities; Proposed eCollection eComments Requested; Revision of a Currently Approved Collection Report of Firearms Transactions—Demand 2 (ATF Form 5300.5), 83 Fed. Reg. 14,671 (Apr. 5, 2018) ....4, 5, 10

Brady, *Gun Store Transparency Project* (last visited Nov. 3, 2026) ....7

Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., Demand 2 Program: Report of Firearms Transactions, ATF Form 5300.5 (rev. Jan. 2025) ....4, 17

Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *FFL Newsletter*, Vol. 1 (Sept. 2013) ....2

Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *Nat'l Firearms in Com. & Trafficking Assessment* vol. IV, pt. III (Jan. 2025) ....3

Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *Types of Federal Firearms Licensees (FFLs)* (last visited Oct. 29, 2026) ....4

Larry Keane, *ATF Data Confirms 'Operation Secure Store' Has Positive Impact*, Nat'l Shooting Sports Found. (Mar. 17, 2023) ....2

Nat'l Shooting Sports Found., *NSSF Confirms ATF Demand 2 Program Is Ending* (June 13, 2025) ....5

Off. of the Inspector Gen., U.S. Dep't of Just., Rep. No. I-2004-005, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives* (2004) ....5

Off. of the Inspector Gen., U.S. Dep't of Just., Rep. No. 23-062, *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees* (2023) ....5, 6

Press Release, Brady, *Amid Trump Administration Rollback of Gun Industry Oversight, Brady Releases Updated Information, Analysis on the Suppliers of America's Gun Violence Epidemic* (June 26, 2025) ....7, 12

Press Release, U.S. Dep't of the Treasury, *Treasury, ATF Release Firearms Report, Gun Trafficking Actions* (Feb. 4, 2000) ....3

Robert Cekada, *Responses to Questions for the Record*, 119th Cong. (Feb. 11, 2026) ....................5

U.S. Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Commerce in Firearms in the United States* (2000) ....................3

The White House, *Illegal Gun Trafficking* (Feb. 4, 2000) ....................3

## INTRODUCTION

Gun trafficking fuels community violence: from drug offenses and trafficking to assaults and homicides. The Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is charged with carrying out critical programs to stem the tide of this violence by controlling the flow of firearms. One such program is ATF's Demand Letter 2 ("DL2") program. Under that program, ATF sends letters demanding additional information to qualifying federally licensed firearms dealers that sold more than a certain quantity of guns recovered by law enforcement from crimes within a short period after their sale, thereby raising gun trafficking concerns. The DL2 program letters notify dealers that they have been enrolled in, or continue to be enrolled in, the DL2 program, and impose additional reporting requirements on them.

The first Trump Administration weakened the DL2 program; and recent public comments by Administration officials suggest the agency has "paused" the program and might discontinue it entirely. At the same time, ATF has also weakened its program of inspecting gun dealers for compliance with federal firearms laws. For these primary reasons, Plaintiff Brady Center to Prevent Gun Violence ("Brady") filed a request under the Freedom of Information Act ("FOIA") for all DL2s issued by ATF to gun dealers in recent years. Brady seeks to use the requested DL2 letters to shed light on how ATF is actually operating this vital public safety program and conducting oversight of gun dealers with indicators of trafficking. Brady's FOIA request is, thus, designed to obtain and make public government documents that bear on how ATF is carrying out its duties — precisely the purpose of why Congress enacted the FOIA.

ATF has previously produced over 4,000 DL2 letters to Brady on multiple occasions under FOIA with almost no redactions. But now, ATF has categorically denied Brady's request under FOIA Exemptions 6, (7)(C), and 4. Exemptions 6 and 7(C) protect personal privacy interests when

they are not outweighed by the public interest and Exemption 4 protects trade secrets and other confidential commercial information.

ATF's position is legally insupportable for two reasons.

*First*, ATF ignores the fact that DL2 recipients are businesses and therefore do not have protected *personal* privacy interests under Exemptions 6 and 7(C). And even if firearms dealers did have cognizable personal privacy interests, the substantial public interest in shedding light on ATF's substantive law enforcement policy would clearly outweigh them.

*Second*, the DL2s — letters sent from a law enforcement agency *to* businesses seeking additional information — do not contain confidential commercial information. Exemption 4 is, therefore, also inapplicable.

Brady asks this Court to grant summary judgment in its favor and require ATF to speedily[1] release the records being improperly withheld.

## FACTUAL BACKGROUND

### I. ATF's DL2 Program Utilizes Federally Licensed Gun Dealers as the First Line of Defense Against Gun Trafficking.

There has long been a general consensus — among ATF, the gun industry, and Congress — that federally licensed dealers are the first line of defense against gun trafficking.[2] Indeed, the Supreme Court has recognized for more than 50 years that "Congress chose to make the [firearms]

[1] This Court has recognized the FOIA's "statutory focus on expedition." *Ctr. to Advance Sec. in Am. v. USAID*, 2025 WL 763735, at *1 (D.D.C. Mar. 11, 2025) (Moss, J.).

[2] *See, e.g.*, Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., FFL Newsletter, Vol. 1, at 2 (Sept. 2013), https://www.atf.gov/media/28891/download ("Remember, the FFL is ATF's first line of defense in preventing firearms from getting into the hands of criminals"); Larry Keane, *ATF Data Confirms 'Operation Secure Store' Has Positive Impact*, Nat'l Shooting Sports Found. (Mar. 17, 2023), https://www.nssf.org/articles/atf-data-confirms-operation-secure-store-has-positive-impact/ (quoting testimony by major firearm industry trade association's President and CEO that "Retailers are the first line of defense against criminals and would-be criminals").

dealer the 'principal agent of federal enforcement'" in preventing the unlawful sale of guns. *Abramski v. United States*, 573 U.S. 169, 186 (2014) (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).

In February 2000, ATF released a comprehensive report on the U.S. firearms industry, finding that just 1.2 percent of licensed gun dealers accounted for more than 57 percent of guns recovered from crimes nationwide ("crime guns").[3] Of those dealers, around 450 had sold 10 or more guns with a time-to-crime of three years or less.[4] ATF has repeatedly identified such a short time-to-crime as a potential indicator of firearms trafficking.[5] Concluding that ATF could "curtail a significant portion of the illegal market in firearms" by "preventing diversion from this concentrated group of dealers," the Bureau implemented a series of "targeted enforcement" measures.[6] One such measure involved sending letters to the approximately 450 gun dealers identified demanding additional information on all secondhand guns[7] offered for sale.[8] This measure is now known as the DL2 program.

---

[3] U.S. Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Commerce in Firearms in the United States* 2 (2000), https://www.nycourts.gov/reporter/webdocs/020400report.pdf (hereinafter *Commerce in Firearms*).

[4] *See id.* As the term suggests, "time-to-crime," or TTC, is the amount of time that elapses between a gun's retail sale and its recovery in connection with a crime by law enforcement.

[5] *Compare id.*, *with* Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *Nat'l Firearms in Com. & Trafficking Assessment* vol. IV, pt. III, at 9 (Jan. 2025), https://www.atf.gov/media/18636/download ("ATF investigative experience indicates TTC of less than three years can be an indicator of illegal firearm trafficking").

[6] *See Commerce in Firearms* at 2.

[7] ATF deemed investigating trafficking involving secondhand, or used, firearms to be uniquely challenging because federal law does not require unlicensed sellers to preserve transfer records, nor does it require gun owners to keep a record of the serial number of their firearms or to report lost or stolen firearms. *Id.* at 26. Gun dealers do, however, maintain transaction records on firearms they sell secondhand. *Id.*

[8] *See* The White House, *Illegal Gun Trafficking* (Feb. 4, 2000), https://clintonwhitehouse5.archives.gov/textonly/WH/Work/020700b.html; Press Release, U.S. Dep't of the Treasury, *Treasury, ATF Release Firearms Report, Gun Trafficking Actions* (Feb. 4, 2000), https://home.treasury.gov/news/press-releases/ls373.

Under the DL2 program, ATF sends letters to gun dealers that sold 25[9] or more guns that had been recovered by law enforcement in the preceding calendar year after having been associated with crimes within three years of their sale. These three-page form letters inform recipient dealers that they have met the threshold (or continue to) and are therefore enrolled in the DL2 Program; the letters then outline the resulting reporting requirements.[10] Gun dealers that receive DL2s are required to report quarterly to ATF basic information about guns acquired into their business inventories from unlicensed sources (e.g. used firearms acquired from non-dealers).[11] Importantly, only specified types of federal firearms licensees are covered by the DL2 program, including type 01 (retail) and 02 (pawn).[12] ATF has indicated that these licensee types are businesses.[13]

The DL2 program's focus on gun dealers that sold higher quantities of quickly recovered crime guns is consistent with ATF's overall oversight practices, including its compliance inspection strategy. ATF conducts "compliance inspections" of existing license holders to ensure

---

[9] As described further *infra*, in 2018, the first Trump Administration increased this threshold from 10 to 25. *See* Agency Information Collection Activities; Proposed eCollection eComments Requested; Revision of a Currently Approved Collection Report of Firearms Transactions—Demand 2 (ATF Form 5300.5), 83 Fed. Reg. 14,671 (Apr. 5, 2018) (hereinafter ATF Form 5300.5 Revision).

[10] For examples of DL2 letters, please *see* Declaration of Joshua Scharff (hereinafter "Scharff Decl.") Exhibit ("Ex.") 3 (Letter from Acting Chief, Nat'l Tracing Ctr. Div., Bureau of Alcohol, Tobacco, Firearms & Explosives, to 1st Nat'l Pawn Inc. (Demand 2 Program: New Participant) (May 5, 2022)); *see id.* Ex. 4 (Letter from Acting Chief, Nat'l Tracing Ctr. Div., Bureau of Alcohol, Tobacco, Firearms & Explosives, to Arrowhead Pawn Shop Inc. (Demand 2 Program: Continued Participation) (May 5, 2022)).

[11] *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., Demand 2 Program: Report of Firearms Transactions, ATF Form 5300.5 (rev. Jan. 2025), https://www.atf.gov/media/23246/download (hereinafter ATF Form 5300.5).

[12] *See id.*; *see also* Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *Types of Federal Firearms Licensees (FFLs)*, https://www.atf.gov/resource-center/infographics/types-federal-firearms-licensees-ffls (last visited Oct. 29, 2026).

[13] *See, e.g.*, ATF Form 5300.5 Revision, *supra* note 9 (when proposing changes to the DL2 program, ATF specifically defined the "affected public" as "Business or other for-profit," and expressly stated no others would be "affected").

that they are obeying the Gun Control Act and other federal firearms laws.[14] It has been ATF's goal to inspect each gun dealer at least once every three years; however, ATF has long been unable to achieve this target.[15] Lacking the resources necessary to complete inspections of all gun dealers on a regular basis, ATF has reported that it uses some of the same criteria that define DL2 recipients — including high crime-gun volumes and short time-to-crime — to identify and prioritize particular gun dealers for inspection.[16]

## II. The Trump Administration's Hostility to the DL2 Program.

Despite the importance of the DL2 program, the Trump Administration took steps in its first term to weaken it. In 2018, ATF loosened the criteria for the program by raising the threshold for sending DL2 letters to gun dealers from ten qualifying crime guns recovered in the prior calendar year to 25.[17] And recent public comments suggest that the Trump Administration might abolish the program completely in its second term. In June 2025, a firearm industry trade association announced that the DL2 program "is ending."[18] Months later, in February 2026, the now Director of ATF (then nominee) Robert Cekada stated the DL2 program was being "paused" to allow ATF "to evaluate the program effectiveness."[19]

---

[14] *See* The Gun Control Act of 1968, Pub. L. No. 90-618. Title 18 U.S.C. Chapter 44.

[15] *Compare* Off. of the Inspector Gen., U.S. Dep't of Just., Rep. No. I-2004-005, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives* iii (2004), https://oig.justice.gov/sites/default/files/legacy/reports/ATF/e0405/final.pdf (hereinafter 2004 OIG Report), *with* Off. of the Inspector Gen., U.S. Dep't of Just., Rep. No. 23-062, *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees* i (2023), https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf (hereinafter 2023 OIG Report).

[16] *Compare* 2004 OIG Report at 23, *with* 2023 OIG Report at 45–46.

[17] *See* ATF Form 5300.5 Revision, *supra* note 9.

[18] *See* Nat'l Shooting Sports Found., *NSSF Confirms ATF Demand 2 Program Is Ending* (June 13, 2025) https://www.nssf.org/articles/nssf-confirms-atf-demand-2-program-is-ending/.

[19] Robert Cekada, Responses to Questions for the Record, 119th Cong. (Feb. 11, 2026) (resp. to Q. 13(a) from Sen. Dick Durbin) https://www.judiciary.senate.gov/imo/media/doc/3502d997-daa5-f550-7914-e7d18cc5b59b/2026-02-04_QFR-Responses_Cekada.pdf.

### III. ATF Categorically Denied Brady's FOIA Request for Recent DL2s, Sharply Breaking from Prior Practice.

Around the same time as Director Cekada's testimony calling into question the continued administration of the DL2 program, Brady sent ATF a FOIA request seeking all DL2 letters issued by ATF to federally licensed gun dealers to date in Fiscal Years 2017, 2019, 2020, 2021, and 2025.[20] (Brady had already received from ATF DL2s from the other recent fiscal years.) Brady's FOIA request seeks only ATF's DL2 letters sent *to* gun dealers and does not seek any information subsequently reported *by* gun dealers to ATF in response to those DL2 letters.

Brady's FOIA request detailed the public interest in disclosure of the requested DL2 letters. Specifically, Brady explained that the requested records would shed important light on both ATF's administration of the DL2 program and whether the agency was conducting inspections of and adequately overseeing the group of gun dealers that sell large quantities of crime guns.[21] The Department of Justice's Office of Inspector General previously found that even some of those dealers identified as inspection priorities have not received recent inspections.[22]

Brady's request also explained that receiving the DL2s from the requested multi-year period would "shed valuable light on the effectiveness or ineffectiveness of the government's gun safety policies and efforts" over time.[23] Brady maintains a database of ATF inspection reports released through FOIA that allows for public oversight of whether ATF has conducted inspections of gun dealers in the DL2 program, whether those inspections identified significant violations of firearms laws and/or illegal sales indicators, and what actions ATF has taken to address those

---

[20] *See* Scharff Decl. Ex. 1.
[21] *See id.*
[22] *See, e.g.*, 2023 OIG Report at 10.
[23] *See* Scharff Decl. Ex. 1.

violations and/or indicators.[24]

On multiple prior occasions, Brady has requested DL2 letters under FOIA, and ATF has responded by producing them with almost no information redacted nor pages withheld.[25] But by letter dated February 23, 2026, ATF categorically denied Brady's FOIA request in full, citing FOIA Exemptions 4, 6, and 7(C).[26] ATF's denial letter largely summarized the basic scope of those Exemptions without explaining how they applied to the requested letters or what foreseeable harm there would be in disclosure.[27]

## IV. The Status of This Litigation.

In complying with this Court's practice rules ahead of summary judgment, ATF reiterated that it was relying on Exemptions 4, 6, and 7(C) to categorically withhold every word of the 9,819 pages the agency reportedly collected in response to Brady's FOIA request.[28] Brady agreed to move for summary judgment first only after receiving Defendants' express confirmation that they will continue to assert only FOIA Exemptions 4, 6, and 7(C) over the requested records.[29]

Brady, accordingly, now moves for summary judgment and respectfully submits it is entitled to prompt receipt of the records it seeks under FOIA.

---

[24] *See* Press Release, Brady, *Amid Trump Administration Rollback of Gun Industry Oversight, Brady Releases Updated Information, Analysis on the Suppliers of America's Gun Violence Epidemic* (June 26, 2025), https://www.bradyunited.org/press/demand-letter-2-program; *see also* Brady, *Gun Store Transparency Project* (last visited Nov. 3, 2026), https://gunstoretransparency.org/.

[25] The requests that Brady's undersigned counsel references here include ATF Requests 2023-00387 (all DL2s issued in FY 2022), 2023-01438 (all DL2s issued in FY 2023), 2024-01606 (all DL2s issued in FY 2024), 2024-00052 (DL2s issued to a specific Georgia FFL), and 2023-00258 (DL2s issued to a specific Minnesota FFL). *See* Scharff Decl. ¶ 7; *see also id.* Exs. 3, 4.

[26] *See* Scharff Decl. Ex. 2.

[27] *See id.*

[28] *See generally* Defs.' Premotion Statement, Dkt. No. 20. Where ATF reports it has collected nearly 10,000 pages of responsive records, *id.*, and where the DL2 form letters Brady seeks are three pages long, *supra* note 10, it appears ATF may have collected around 3,000 DL2 letters in response to Brady's request.

[29] *See* Joint Mot. to Adjust Briefing Schedule, Dkt. No. 22.

## LEGAL STANDARD

"At all times courts must bear in mind that FOIA mandates a strong presumption in favor of disclosure." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (citations omitted). "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Id.* (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)). "[T]he 'burden is on the agency' to show that requested material falls within a FOIA exemption.'" *Id.* (quoting *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)). Courts review agencies' claims of exemption *de novo*. *See DOJ v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989).

FOIA Exemption 6 excludes from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) excludes records or information compiled for "law enforcement purposes," "but only to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). When an agency invokes both Exemptions 6 and 7(C), as Defendants have done here, courts "focus" on Exemption 7(C) because it "establishes a lower bar for withholding material." *CREW v. DOJ*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014). Exemption 4 excludes from disclosure records that contain trade secrets and commercial or financial information obtained from a person that is privileged or confidential. 5 U.S.C. § 552(b)(4).

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment in favor of [a] FOIA plaintiff is appropriate" "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Petroleum Info.*

*Corp.*, 976 F.2d at 1433. This occurs when an agency's justification "for invoking a FOIA exemption" is neither "logical" nor "plausible." *ACLU v. CIA*, 710 F.3d 422, 427, 431 (D.C. Cir. 2013).

## ARGUMENT

ATF cannot carry its burden to support categorical denial of Brady's FOIA request for recent DL2 letters. *First*, ATF's withholding of every word of the 9,819 pages responsive to Brady's request under Exemptions 6 and 7(C) is obviously improper and cannot be sustained because the businesses to which ATF's letters are addressed do not have cognizable privacy interests under those Exemptions; and even if they did, any such privacy interests would be clearly outweighed by the public interest in shedding light on ATF's operation of a key public safety program. Second, ATF's withholding in full under Exemption 4 is improper and cannot be sustained because ATF's letters *to* businesses do not comprise confidential commercial information. Having failed to carry their burden to establish that these FOIA exemptions apply, Defendants must release the DL2 letters Brady seeks under FOIA.[30]

### I. ATF Cannot Categorically Withhold the Requested DL2 Letters under Exemptions 6 and 7(C).

ATF claims that Exemptions 6 and 7(C) justify categorical withholding of every one of the recent DL2s Brady seeks, but the federally licensed gun dealers to which ATF's DL2 letters are addressed do not have cognizable personal privacy interests under those Exemptions. Even if these businesses had protectible privacy interests under these Exemptions, they would be outweighed by the public interest in disclosure.

---

[30] Brady does not currently have sufficient information to assess the adequacy or scope of the agency's search, but reserves all legal challenges pending review of the agency's search declaration and/or production of responsive documents.

### A. Dealers in the Business of Selling Firearms Do Not Have "Personal" Privacy Interests Protected by Exemptions 6 and 7(C).

Defendants cannot overcome what this Court has previously described as the "dispositive difficulty" that businesses do not have protectible "personal" privacy interests under Exemptions 6 and 7(C). *Shteynlyuger v. CMS*, 698 F. Supp. 3d 82, 131 (D.D.C. 2023) (Moss, J.). This point alone defeats ATF's categorical withholding of DL2s sent to gun dealers. DL2s are letters addressed to *businesses*. *See* 18 U.S.C. § 923(a) (dealers enrolled in the DL2 program are definitionally "engage[d] in the business of . . . dealing in firearms"); *see also* ATF Form 5300.5 Revision, *supra* note 9 (specifying the DL2 program "affect[s]" only "business or other for-profit"). The Supreme Court has been clear that businesses do not have protectable "personal privacy" interests for the purposes of Exemptions 6 and 7(C). *See FCC v. AT&T, Inc.*, 562 U.S. 397 (2011).[31] Indeed, the Court in *FCC* emphasized that the "personal" privacy interests protected by Exemptions 6 and 7(C) are fairly read to be "precisely the *opposite* of business related" interests. *Id.* at 404–05.

The privacy protections of those exemptions are, accordingly, irrelevant to gun dealers' receipt of form regulatory letters in their capacities as licensed dealers "in the business" of firearms sales. Indeed, the D.C. Circuit has specifically rejected requests to block release of investigative records identifying businesses and affiliated individuals on personal privacy grounds. *See Doe 1 v. FEC*, 920 F.3d 866, 873 (D.C. Cir. 2019) (explaining that FOIA personal privacy exemptions are concerned with information of "'an intimate personal nature' such as marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, and reputation" (quoting *Sims v. CIA*, 642 F.2d 562, 574 (D.C. Cir.

[31] This Court has recognized that "the scope of Exemption 6 and Exemption 7(C) should be understood to mirror one another." *Shteynlyuger*, 698 F. Supp. 3d at 131 (discussing *FCC*, 562 U.S. at 408–10).

1980))). The *Doe* court explained that "[i]nformation relating to business judgments and relationships does not qualify for exemption," "even if disclosure might tarnish someone's professional reputation." *Id.* (quoting *Wash. Post Co. v. DOJ*, 863 F.2d 96, 100 (D.C. Cir. 1988)).

The DL2 letters Brady seeks concern business, not personal, information. That a business received a letter stating it had sold over a certain threshold of firearms recovered by law enforcement from crimes over a short period and imposing additional reporting requirements on the business reveals nothing of "an intimate personal nature." *Id.* At most, any such disclosure reveals "information relating to business judgments" in the form of firearms dealers' business practices. *Id.* These are not "personal" privacy interests cognizable under FOIA and ATF has not argued otherwise. *See* Defs.' Premotion Statement at 4–5. That release of the letters might *hypothetically* have some effect on some businesses' "professional reputation," does not transform the requested information into protectible "personal" data. *Doe*, 920 F.3d at 873. Given *FCC*'s dispositive holding, even *attempting* to assert a cognizable privacy interest here would require ATF to make individualized, contextualized arguments on behalf of each recipient involved — a showing that is wholly incompatible with ATF's categorical withholding of every word of every DL2 letter collected. *Cf. Edelman v. SEC*, 239 F. Supp. 3d 45, 57 (D.D.C. 2017) (Moss, J.) (acknowledging the "fact-intensive nature of the required inquiry" under Exemption 6 in rejecting blanket withholding); *supra* note 31.

### B. Even if Gun Dealers Had Protectible Privacy Interests, the Public Interest in Disclosure Would Outweigh Them.

Even if ATF somehow could muster a cognizable privacy interest here, any such interest would be clearly outweighed by the public interest in disclosure. *See NARA v. Favish*, 541 U.S. 157, 172 (2004) (personal privacy exemptions may be overcome when "the public interest sought to be advanced is a significant one" and "the information is likely to advance that interest").

As Brady explained in its FOIA request, disclosure of the DL2s would shed critical public light on how ATF is operating the DL2 program — a program that implicates issues of life-and-death — and the agency's effectiveness in doing so. *See* Scharff Decl. Ex. 1. Brady uses the DL2 letters it receives to conduct holistic, publicly available assessments of ATF's operation of the DL2 program, as well as ATF's other oversight activities, including inspections of gun dealers.[32] For example, Brady crosschecks the DL2s it receives against inspection reports ATF has produced to assess whether the agency is prioritizing DL2 recipients for inspection, as ATF's stated criteria indicates that they should be, and how the agency is remediating any violations it uncovers.[33] Brady also examines the geographic distribution of DL2 recipients to assess whether ATF is targeting its inspection and oversight resources to particular geographic areas.[34] And, Brady assesses whether ATF is issuing DL2s to the same gun dealers year-after-year, which informs the public about the general efficacy of ATF's oversight and enforcement efforts over that period. Each of these uses sheds important light on how ATF is administering the DL2 program and carrying out its broader oversight mandate. *See Bartko v. DOJ*, 898 F.3d 51, 66 (D.C. Cir. 2018) (courts "measure the public interest by the extent to which disclosure would advance the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny" (cleaned up)).

This public interest is particularly heightened by steps the Trump Administration took in its first term to weaken the DL2 program and recent comments suggesting the Administration might not continue the program at all. *Supra* Factual Background Section II. As the D.C. Circuit has repeatedly recognized, "matters of substantive law enforcement policy . . . are properly the

[32] *See, e.g.*, Brady, *supra* note 24.
[33] *See id.; see also supra* pp. 4–5 and accompanying notes 14–16.
[34] *See* Brady, *supra* note 24.

subject of public concern." *CREW*, 746 F.3d at 1093. Thus, the important public interest in the DL2 information Brady seeks would clearly outweigh any hypothetically protectible privacy interest a gun dealer may assert in the fact that it was one among potentially thousands of businesses[35] that received a DL2 letter from ATF.

## II. ATF Has Not Met Its Burden to Categorically Withhold the DL2 Letters under Exemption 4.

ATF further claims that Exemption 4 justifies categorical withholding of the DL2 letters Brady seeks, but these notification letters do not comprise or contain commercial information at all, let alone confidential commercial information. To justify withholding the DL2s in full under Exemption 4, ATF must show that they are: (1) commercial or financial information; (2) obtained from a person; and (3) privileged or confidential. 5 U.S.C. § 552(b)(4).[36] At base, DL2s are form notification letters that ATF sends *to* gun dealers. *See, e.g.*, Scharff Decl. Exs. 3 & 4 (example DL2 letters ATF previously produced to Brady via FOIA displaying no withholdings under Exemption 4). These letters inform recipients they have been enrolled in the DL2 program and impose additional reporting requirements on them. *Id.*[37] At a minimum, Defendants' withholdings fail Exemption 4's first and third requirements.

---

[35] *Supra* note 28 (calculating that ATF may have collected over 3,000 DL2 letters in response to Brady's FOIA request).

[36] Exemption 4 also shields from disclosure "trade secrets" that meet the remaining requirements. *See* 5 U.S.C. § 552(b)(4). ATF does not argue that the DL2s comprise or contain "trade secrets." *See* Defs.' Premotion Statement at 2–3. Nor could they. *See Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983) (defining "trade secrets" as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort").

[37] ATF agrees with this description. *See* Defs.' Premotion Statement at 3 ("Essentially, the letters inform the seller that they are enrolled in the Demand Letter 2 Program, which requires them to report certain additional information . . . .").

**The DL2s do not contain "commercial" information:** Concerning the first requirement, the D.C. Circuit has been clear that Exemption 4 covers "only information that, *in and of itself*, demonstrably pertains to the exchange of goods or services or the making of a profit." *See CREW v. DOJ*, 58 F.4th 1255, 1265 (D.C. Cir. 2023) (emphasis added). "[T]he government may not rely on Exemption 4 where the withheld information *only* tenuously or *indirectly* concerns the exchange of goods or services or the making of a profit." *Id.* (emphasis added).

The DL2s are merely notification letters that do not, "in and of themselves," concern the "exchange of goods or the making of a profit." *Id.* They are not a contract, profit-and-loss statement, inventory or customer list, or any other "paradigmatic" example the D.C. Circuit has said "actually reveal basic commercial operations." *Id.* at 1263. Indeed, the example DL2 letters Brady submits as exhibits here do not contain any information whatsoever about the number of firearms the recipient gun dealers sold, the makes and models of the firearms that the businesses transferred, their price, how they were marketed, or the buyers' information. *See* Scharff Decl. Exs. 3, 4. Rather, these letters sent by a federal agency to businesses seeking additional information, at most, *indirectly* suggest that an exchange of goods (i.e., guns) occurred in the past. Because an inferential step is required to reach an actual "exchange of goods," the DL2s do not meet the D.C. Circuit's definition of "commercial information," which does not sweep so broadly as to cover anything that merely implies a previous exchange of goods occurred.

To the extent that ATF seeks to use the hypothetical possibility of commercial harm to bolster its bare assertion that the DL2s are commercial information, the D.C. Circuit has explained that commercial consequences of disclosure do not impart a commercial character to requested information: "Exemption 4 does not protect against any and all commercial harm;" "that disclosure might cause commercial repercussions does not suffice to show that information is 'commercial'

under Exemption 4." *CREW*, 58 F.4th at 1264, 1267–68 (contractors' identities were not "commercial" information solely because their disclosure could have commercial consequences). ATF has not, as it cannot, establish that the requested DL2s — form notification letters that impose reporting requirements on gun dealers — comprise "commercial information." ATF, accordingly, cannot back its way into Exemption 4 by speculating that release of the requested DL2s *could* have "commercial consequences."

**The DL2s do not contain "confidential" information:** ATF's withholdings also fail to meet Exemption 4's "confidentiality" requirement. The Government acknowledges that "confidential information" is information that "is customarily kept private, or at least closely held, *by the person imparting it*"; or (2) "*the party receiving it* provides some assurance that it will remain secret." *See* Defs.' Premotion Statement at 3 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019)) (emphasis added by Plaintiff). Again, as the example DL2s demonstrate, *see* Scharff Decl. Exs. 3, 4, these form letters do not contain information *imparted to* ATF by the recipient gun dealers; rather, they *seek* information from the recipients (and Brady has not requested any of that subsequently reported information). Moreover, ATF has routinely made DL2s public, including to Brady on at least five occasions in recent years.[38] These prior public disclosures demonstrate that ATF has not assured gun dealers that the DL2 letters it sends will remain secret. Indeed, the opposite is demonstrably true.

The DL2s, therefore, do not contain "commercial" or "confidential" information in any logical or plausible sense, and Exemption 4 does not apply. *ACLU*, 710 F.3d at 431. And even if these letters did contain *some* confidential commercial information (which they do not), ATF has made no attempt to meet its burden under FOIA to explain why any such information cannot be

[38] *Supra* note 25 (describing ATF's prior releases of DL2s to Brady under FOIA).

reasonably segregated from the remainder of the DL2 letters. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

**There is no foreseeable harm permitting withholding:** The foregoing failures are sufficient to reject ATF's categorical withholdings of the DL2s under Exemption 4, but the agency also fails to establish meaningful foreseeable harm from disclosure to the interests protected by Exemption 4. *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024) (even otherwise exempt information must be released where disclosure would not "foreseeably harm an interest protected by the exemption"); *Shteynlyuger*, 698 F. Supp. 3d at 123–24 (applying foreseeable harm requirement in Exemption 4 context).

One of the "harms" ATF has articulated is not cognizable under Exemption 4. ATF first asserts that release of the DL2s will harm the agency's ability to conduct investigations through "voluntary" information sharing. *See* Defs.' Premotion Statement at 3. But the D.C. Circuit has been clear that "Exemption 4 does not in any way refer to the government's interests." *CREW*, 58 F.4th at 1264 (contrasting Exemption 4 with Exemption 7(A), which *does* consider the government's investigative interests). And, in any case, the information sharing required by the DL2 program is not "voluntary." *See* ATF Form 5300.5, *supra* note 11 (instructing DL2 recipients that they "must complete" the transaction reporting form).

The other harm ATF posits — "foreseeable harm to the [gun dealers'] economic or business interests," *see* Defs.' Premotion Statement at 3 — also cannot be credited here. Where each recipient would simply be one among hundreds or thousands of businesses that received similar letters in the nearly 10,000 pages of records responsive to Brady's request,[39] ATF has not, and

[39] *Supra* note 28.

cannot, carry its "independent and meaningful burden" to "provide a non-generalized explanation o[f] the foreseeable harm" to recipient gun dealers' commercial interests "that would result from disclosure" of the form letters Brady seeks. *Shteynlyuger*, 698 F. Supp. 3d at 124 (first quoting *Reps. Comm. for Freedom of Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) and then quoting *Reps. Comm. for Freedom of Press v. CBP*, 567 F. Supp. 3d 97, 124 (D.D.C. 2021)).

The absence of foreseeable harm is an independent reason that Exemption 4 cannot categorically shield the DL2 letters Brady has requested.

## CONCLUSION

For the foregoing reasons, Brady respectfully requests the Court grant its motion for summary judgment and order Defendants to promptly disclose the agency records responsive to Brady's FOIA request. A proposed order is attached.

Dated: November 4, 2026

Respectfully submitted,

*/s/ Amy C. Vickery*
Amy C. Vickery
(admitted pro hac vice)*
Daniel A. McGrath
D.C. Bar #1531723
Ronald A. Fein
D.C. Bar #90026641
Robin F. Thurston
D.C. Bar #7268942
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
avickery@democracyforward.org
dmcgrath@democracyforward.org
rfein@democracyforward.org
rthurston@democracyforward.org

**Not admitted to practice law in the District of Columbia; practicing under the supervision of Democracy Forward lawyers who are members of the DC Bar.*

*/s/ Douglas N. Letter*
Douglas N. Letter
(Bar No. 253492)
Tess M. Fardon
(Bar No. 1618267)
Brady Center to Prevent Gun Violence
840 First Street NE, Suite 400
Washington, D.C. 20002
(202) 370-8160
dletter@bradyunited.org
tfardon@bradyunited.org

*Counsel for Plaintiff*